**U.S. SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**J. Thomas TALBOT, Defendant.**

**No. 04–04556MMMPLAX.**

United States District Court,
C.D. California.

Feb. 14, 2006.

Erica Y. Williams, Luis R. Mejia, Robyn R. Bender, Washington, DC, Nicolas Morgan, Los Angeles, CA, for Plaintiff.

Lance A. Etcheverry, Richard Marmaro, Skadden Arps Slate Meagher and Flom, Lisa A. Callif, Robert H. Horn, Proskauer Rose, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MORROW, District Judge.

On June 24, 2004, plaintiff U.S. Securities and Exchange Commission (the

"SEC") filed this action against defendant J. Thomas Talbot, alleging that defendant had traded on nonpublic information in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b–5 ("Rule 10b–5"), 17 C.F.R. § 240.10b–5. The SEC asserts that, in his position as a director of Fidelity National Financial, Inc., Talbot learned material nonpublic information regarding the possible acquisition of LendingTree, Inc., and traded on the information, realizing a profit of $67,881.20. The SEC seeks an order requiring Talbot to disgorge this profit with prejudgment interest and to pay civil penalties. It also seeks an order enjoining Talbot from violating the securities laws in the future, and from serving as an officer or director of a publicly held company. The parties have now filed cross-motions for summary judgment.[1]

## I. FACTUAL BACKGROUND

Defendant J. Thomas Talbot is a sixty-nine or seventy year-old businessman who resides in Newport Beach, California.[2] Talbot received a degree in economics from Stanford University, and a law degree from Hastings College of Law.[3] For the past thirty years, Talbot has served on the boards of several publicly traded companies.[4] In 1988 or 1989, Talbot joined the board of Fidelity, a public company that is traded on the New York Stock Exchange.[5] Talbot served as a Fidelity director until September 19, 2003, when he resigned after being notified of the SEC's investigation, *In the Matter of Trading in the Securities of LendingTree, Inc.*[6] Talbot is currently a director of another publicly traded company, Hallwood Group, Inc.[7]

Fidelity is a national title insurance company. LendingTree is an online lending

1. On June 27, 2005, the court entered an order denying Talbot's motion for reconsideration of an order issued by Magistrate Judge Paul Abrams. Judge Abrams denied Talbot's motion to compel production by the SEC of its attorneys' notes of investigative interviews of five witnesses—Brent Bickett, Terry Christensen, William Foley II, Cary Thompson, and Frank Willey. Although it denied reconsideration, the court held that the SEC would be required to produce the notes if it sought to rely on the investigative testimony of any of these witnesses in support of a motion for summary judgment or at trial. On July 6, 2005, the SEC filed a *Notice of Amendment To Its Motion For Summary Judgment*, stating that it no longer relied on Frank Willey's testimony in support of the motion. The SEC also represented that it would disclose its notes of Talbot's investigative interview to his counsel. Since Talbot has not raised the issue, this order presumes that the SEC has given Talbot a copy of its notes.

2. Proposed Statement of Uncontroverted Facts and Conclusions of Law re Motion by Defendant J. Thomas Talbot's for Summary Judgment ("Def.'s Facts"), ¶ 1; Proposed Statement of Uncontroverted Facts and Conclusions of Law in Support of Plaintiff's Mo-

tion for Summary Judgment Against Defendant J. Thomas Talbot ("Pl.'s Facts"), ¶ 2; Defendant J. Thomas Talbot's Statement of Genuine Issues in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Genuine Issues"), ¶ 2. Plaintiff's Statement of Genuine Issues and Response to Defendant's Statement of Alleged Uncontroverted Facts ("Pl.'s Genuine Issues") responds only to those portions of Talbot's Statement of Uncontroverted Facts that the SEC disputes.

3. Def.'s Facts, ¶ 2; Pl.'s Facts, ¶ 3; Def.'s Genuine Issues, ¶ 3.

4. Def.'s Facts, ¶ 2; Pl.'s Facts, ¶ 2; Def.'s Genuine Issues, ¶ 2.

5. Def.'s Facts, ¶ 2; Pl.'s Facts, ¶ 4; Def.'s Genuine Issues, ¶ 4. Although the SEC asserts that Talbot became a Fidelity director "[in] or about 1998," its Statement of Genuine Issues does not dispute that he joined the Fidelity board in 1988 or 1989.

6. Def.'s Facts, ¶ 2; Pl.'s Facts ¶ 4; Def.'s Genuine Issues, ¶ 4.

7. Pl.'s Facts, ¶ 2; Def.'s Genuine Issues, ¶ 2.

and realty services exchange.[8] From February to at least May 5, 2003, Fidelity held an ownership interest in LendingTree.[9] In February 2003, Douglas Lebda, LendingTree's CEO, notified Fidelity's Executive Vice President, Brent Bickett, of a possible third-party acquisition of LendingTree and asked whether Fidelity would be interested in making an offer.[10] Two months later, on April 18 or 19, 2003, Lebda told Bickett that LendingTree had entered into acquisition negotiations with a third party.[11] Shortly after speaking with Lebda, and some time prior to April 22, 2003, Bickett relayed the news to William Foley, Fidelity's CEO and Chairman.[12]

**8.** Def.'s Facts, ¶¶ 3–4; Pl.'s Genuine Issues, ¶¶ 1, 2. Plaintiff does not dispute the fact that Fidelity is a national title insurance company; it asserts, however, that Talbot's characterization of Fidelity as "a Fortune 500 company and the nation's largest title insurance company" is immaterial. (Pl.'s Genuine Issues, ¶ 1.)

**9.** Def.'s Facts, ¶ 4; Pl.'s Facts, ¶ 6; Def.'s Genuine Issues, ¶ 6. The parties dispute the size of Fidelity's ownership interest in LendingTree in 2003. Talbot contends that Fidelity owned approximately 8 to 9% of the publicly traded stock of LendingTree. (Def.'s Facts, ¶ 4 (Deposition of Cary Thompson ("Thompson Depo.") at 31:5–8).) The SEC asserts that Fidelity owned at least 10% of LendingTree. (Pl.'s Genuine Issues, ¶ 2 (Deposition of Douglas Lebda ("Lebda Depo.") at 14:11–15:3; Deposition of Terry Christensen ("Christensen Depo.") at 36:15–19).) Although disputed, the exact percentage of Fidelity's ownership is not material to any genuine issue in the case.

**10.** Def.'s Facts, ¶ 5; Pl.'s Genuine Issues, ¶ 3. The parties agree that one reason Lebda asked Bickett about Fidelity's interest in acquiring LendingTree was because Fidelity already owned stock in LendingTree. (See Def.'s Facts, ¶ 5; Pl.'s Genuine Issues, ¶ 3.) Talbot asserts that another reason for Lebda's inquiry was Fidelity's "involve[ment] in the mortgage industry." (Def.'s Facts, ¶ 5 (Lebda Depo. at 57:14–58:25).) The SEC disputes this, and Lebda testified that he asked whether Fidelity would be interested in acquiring LendingTree because he knew from prior discussions that Fidelity "had interest in businesses such as LendingTree." (Pl.'s Genuine Issues, ¶ 4 (Lebda Depo. at 58:17–21).) The parties' disagreement on this point is not material to the issues raised by the cross-motions.

**11.** Def.'s Facts, ¶ 6; Pl.'s Facts, ¶ 7. Defendant notes that "Bickett and Lebda gave conflicting testimony: Lebda testified he told Bickett the information was confidential, but Bickett disputed this." (Def.'s Genuine Issues, ¶ 7.)

**12.** Pl.'s Facts, ¶ 7 (Bickett Depo. at 45:7–49–6). Talbot argues that the deposition testimony of Bickett and William Foley ("Foley Depo."), is inadmissible under Rule 32(a)(3) of the Federal Rules of Civil Procedure, because the SEC gave him only two days' notice of the depositions. (See Defendant J. Thomas Talbot's Evidentiary Objections in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Evid. Obj.") at 1, 3.) The SEC counters that it gave Talbot at least six weeks' notice that it intended to take these depositions on May 24, 2005. (See Plaintiff's Response to Defendant J. Thomas Talbot's Evidentiary Objections ("Pl.'s Evid. Resp.") at 1.)

The parties agree that on April 4, 2005, SEC counsel Erica Y. Williams served Talbot's attorney, Robert H. Horn, with notice that the Bickett and Foley depositions would take place on May 24, 2005, in Jacksonville, Florida. (See Declaration of Erica Y. Williams Submitted in Support of Plaintiff's Motion for Summary Judgment against Defendant J. Thomas Talbot and Plaintiff's Response to Defendant's Evidentiary Objections ("Williams Resp. Decl."), ¶ 7; id., Ex. 8; Declaration of Robert H. Horn in Opposition to Plaintiff's Motion for Summary Judgment ("Horn Opp. Decl."), ¶ 10; id., Ex. 9.) On April 14, 2005, the parties participated in a telephonic status conference with the court, during which they requested that the discovery cut-off date be extended to June 30, 2005. On May 10, 2005, the court issued an order extending the date for the completion of discovery to June 3, 2005. Horn did not see the order until May 16, 2005; Williams did not see it until May 17, 2005. (Horn Opp. Decl., ¶ 13; Williams Resp. Decl., ¶ 12.) On May 17, 2005, before Williams received notice of the court's order, and at a time when she

On April 22, 2003, Fidelity held a quarterly meeting of its board of directors that Talbot attended.[13] The meeting lasted approximately four to five hours; during this time, the board discussed several different items that were identified on the meeting agenda.[14] Near the end of the meeting, Foley raised LendingTree and its potential acquisition by an unnamed third party.[15] He told the board that Fidelity would likely benefit if a third party acquired LendingTree.[16] Talbot wrote the words

apparently believed that the court would extend the discovery cut-off date to June 30, Williams served an amended deposition notice setting the Bickett and Foley depositions for June 21–23, 2005. (Horn Opp. Decl., ¶ 14; *id.*, Ex. 12; Williams Resp. Decl., ¶¶ 9, 11.) On May 20, 2005, after receiving the court's order regarding the new discovery cut-off date, Williams faxed Horn a second amended notice that set the Bickett and Foley depositions back to May 25, 2005. (Horn Opp. Decl., ¶ 15; *id.*, Ex. 13.)

Rule 32(a)(3) provides in relevant part: "[N]or shall a deposition be used against a party who, having received less than 11 days notice of a deposition, ... promptly upon receiving such notice file[s] a motion for a protective order...." FED.R.CIV.PROC. 32(a)(3). The court agrees with Judge Abrams' observation "that defendant was put on notice on April 4, 2005, that plaintiff intended to depose the two deponents at issue herein on May 24 and May 25, 2005," and "that the only change in plaintiff's amended and second amended notices ... concerned the dates on which the depositions would occur, not if they would occur or who would be deposed." (Horn Opp. Decl., Ex. 18 (Magistrate Judge's Order re Defendant's Motion for Protective Order, June 15, 2005).) Between April 4 and May 17, 2005, Talbot's attorney knew that the depositions were scheduled for May 24–25. The amended deposition notices, which scheduled the depositions for late June, had an effective life of two to three days at the most (i.e., May 17 to May 20, 2005).

Under these circumstances, the court concludes that Talbot had adequate and reasonable notice that the Bickett and Foley depositions would take place on May 24–25, 2005. See FED.R.CIV.PROC. 32(a) ("At the trial or upon the hearing of motion or an interlocutory proceeding, any part of all of deposition ... may be used against any party who was present or represented at th taking of the deposition or who had *reasonable notice* thereof..." (emphasis added)); FED.R.CIV. PROC. 32, Advisory Committee Note ("Inclusion of the provision [in Rule 32(a)(3)] is not intended to signify that 11 days' notice is the minimum advance notice for all depositions or that greater than 10 days should necessarily be deemed sufficient in all situations"). Accordingly, defendant's Rule 32(a)(3) objections to the admissibility of the Bickett and Foley depositions are overruled.

13. Def.'s Facts, ¶ 7; Pl.'s Facts, ¶ 8; Def.'s Genuine Issues, ¶ 8.

14. Def.'s Facts, ¶ 7; Pl.'s Genuine Issues, ¶ 5.

15. Def.'s Facts, ¶ 7; Pl.'s Genuine Issues, ¶ 5. Talbot asserts that the LendingTree discussion was "spontaneous" since the matter was not referenced on the meeting agenda or in the minutes. (Def.'s Facts, ¶ 7; Declaration of J. Thomas Talbot in Support of Motion for Summary Judgment ("Talbot Decl."), Ex. 1 (Meeting Agenda); Ex. 2 (Meeting Minutes).) The SEC argues that the LendingTree discussion was not "spontaneous" because informational items are "rarely put on ... board meeting agendas." (Pl.'s Genuine Issues, ¶ 5.) It also notes that "Foley testified ... he learned the *information about the possible LendingTree* acquisition too late for it to be placed on the agenda for the April 22 meeting." (*Id.* (Foley Depo. at 54:15–55:11).) Despite their dispute regarding the word "spontaneous[ly]," the parties agree that acquisition of LendingTree was not a regular agenda item, and that it came to Foley's attention just prior to the April 22, 2003 meeting. (See Foley Depo. at 62:24–63:9.)

16. Foley asserts he told the board that the potential premium "was at least $15 a share and [that it would likely be] closer to $18 a share for an acquisition price." He also contends he told the board that Fidelity would likely make a $50 million profit if the LendingTree acquisition materialized. (Foley Depo. at 62:5–63:15). Talbot, by contrast, asserts that the only thing he heard at the board meeting about LendingTree was that someone might be interested in purchasing the company and that Fidelity would benefit if the transaction was consummated. (Def.'s Genuine Issues, ¶ 10.)

*"Lending Tree"* at the top of his agenda; these were the only notes he took during the meeting.[17]

On April 24, 2003, two days after the Fidelity board meeting, Talbot purchased 5,000 shares of LendingTree common stock at approximately $13.50 per share.[18] Prior to April 24, 2003, Talbot had never traded in LendingTree securities.[19] The next day, on April 25, 2003, Lebda contacted Bickett to update him on the status of the proposed tender offer and to give Bickett a Voting Agreement that LendingTree wished to have Fidelity sign.[20] Also on April 25, 2003, Fidelity and LendingTree entered into a written letter agreement restricting the use to which Fidelity could put confidential information it received in connection with the proposed tender offer.[21] On April 30, 2003, Talbot purchased an additional 5,000 shares of LendingTree common stock at approximately $14.50 per share.[22]

Several events occurred on May 5, 2003. First, LendingTree and USA Interactive ("USAI"), a publicly traded company, issued a joint press release announcing an agreement pursuant to which USAI was to acquire all of LendingTree's outstanding capital stock in a stock-for-stock transaction.[23] Second, Fidelity and LendingTree entered into a Voting Agreement, which required that Fidelity vote its Lending-Tree shares in favor of the proposed tender offer.[24] Third, after the public announcement was made, Talbot sold the 10,000 shares of LendingTree stock that he owned at $20.94 per share, realizing a profit of $67,881.20.[25] LendingTree's stock closed at $20.72 per share, increasing $6.03 per share, or 41%.[26]

It is undisputed that some of the information discussed at Fidelity board meetings is nonpublic and confidential.[27] Other Fidelity directors present at the April 22, 2003 meeting considered the information regarding the potential acquisition of Len-

**17.** Pl.s' Facts, ¶ 10; Def.'s Genuine Issues, ¶ 10.

**18.** Def.'s Facts, ¶ 10; Pl.'s Facts, ¶ 11; Def.'s Genuine Issues, ¶ 11; see Declaration of Erica Y. Williams in Support of Plaintiff's Motion for Summary Judgment against Defendant J. Thomas Talbot ("Williams Decl."), Ex. C (client statements from Roth Capital Partners for April and May 2003).

**19.** Pl.'s Facts, ¶ 15; Def.'s Genuine Issues, ¶ 15.

**20.** Def.'s Facts, ¶ 11; Pl.'s Facts, ¶ 8. The SEC does not dispute the truth of this statement; it asserts, however, that it is immaterial to any genuine issue in the case. The date on which Fidelity received the voting agreement is relevant, however, in assessing whether Fidelity, and derivatively Talbot, owed LendingTree any duty of confidentiality as of April 18 or 19, 2003.

**21.** Def.'s Facts, ¶ 12; Pl.'s Genuine Issues, ¶ 9. The SEC does not dispute the truth of this statement; it asserts, however, that it is immaterial to any genuine issue in the case.

The date on which Fidelity signed the confidentiality agreement is relevant, however, in assessing whether Fidelity, and derivatively Talbot, owed LendingTree any duty of confidentiality prior to that date.

**22.** Def.'s Facts, ¶ 10; Pl.'s Facts, ¶ 12; Def.'s Genuine Issues, ¶ 12.

**23.** Def.'s Facts, ¶ 14; Pl.'s Facts ¶ 13; Def.'s Genuine Issues, ¶ 13.

**24.** Def.'s Facts, ¶ 15; Pl.'s Genuine Issues, ¶ 11. The SEC does not dispute the truth of this statement; it simply asserts that it is immaterial to any genuine issue in the case.

**25.** Def. Facts, ¶ 16; Pl.'s Facts, ¶ 14; Def.'s Genuine Issues, ¶ 14.

**26.** Pl.'s Facts, ¶ 13; Def.'s Genuine Issues, ¶ 13.

**27.** Pl.'s Facts, ¶ 8; Def.'s Genuine Issues, ¶ 8; Pl.'s Genuine Issues, ¶ 10 (Testimony of J. Thomas Talbot ("Talbot Testimony") at 19:22–20:3).

dingTree confidential.[28] Talbot testified that all he heard at the board meeting was that "some person or company might be interested in acquiring LendingTree and that Fidelity would benefit if the transaction occurred." He contends that this alleged "rumor" caused him to investigate LendingTree further.[29] Talbot was the only individual at the April 22, 2003 board meeting who traded in LendingTree securities between April 22 and May 5, 2003.[30]

## II. DISCUSSION

### A. Legal Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or otherwise as provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir.1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

As noted, the parties have filed cross-motions for summary judgment. "[T]he mere fact that the parties make cross-motions for summary judgment does not necessarily mean that there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir.1975); see also *Fair Housing Council of Riverside County, Inc. v. River-*

---

**28.** See Foley Depo. at 34:18–35:1, 36:15–21; Bickett Depo. at 45:14–46:9.

**29.** Def.'s Genuine Issues, ¶ 10 (Thompson Depo. at 55:2–8; Talbot Decl., ¶ 5); see Talbot Testimony at 51:9–25.

**30.** Pl.'s Facts, ¶ 16; Def.'s Genuine Issues, ¶ 16.

*side Two,* 249 F.3d 1132, 1136 (9th Cir. 2001) ("It is well-settled in this circuit and others that the filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present. A summary judgment cannot be granted if a genuine issue as to any material fact exists"). Rather, "the court must review the evidence submitted in support of each cross-motion," and consider each motion on its merits. *Fair Housing Council of Riverside County,* 249 F.3d at 1136.

## B. Legal Standard Governing Liability Under Section 10(b) And Rule 10b–5

Section 10(b) of the Exchange Act makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Under Rule 10(b)(5), which the SEC promulgated pursuant to section 10(b), one may not "... employ any device, scheme, or artifice to defraud; ... or ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

■ Liability for trading on confidential information under section 10(b) and Rule 10b–5 can be predicated on either a "classical" or "misappropriation" theory. *United States v. O'Hagan,* 521 U.S. 642, 650, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). Under the classical theory, a corporate insider commits securities fraud when he breaches his fiduciary duty to the corporation's shareholders by "trad[ing] in the securities of his corporation on the basis of material, nonpublic information." *Id.* at 651–52, 117 S.Ct. 2199; see *SEC v.*

*Truong,* 98 F.Supp.2d 1086, 1095 (N.D.Cal. 2000) ("In order to establish an 'insider trading' violation of Section 10(b) and Rule 10b–5, the SEC must show that a defendant is a corporate insider who purchased or sold securities while in possession of material, non-public information, and acted with scienter," citing *Dirks v. SEC,* 463 U.S. 646, 653–54, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), and *SEC v. Soroosh,* No. C–96–3933–VRW, 1997 WL 487434, *2 (N.D.Cal. Aug.5, 1997)).

By contrast, under the misappropriation theory, "a person commits fraud 'in connection with' a securities transaction, and violates § 10(b) and Rule 10b–5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of that information." *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199; see *United States v. Kim,* 184 F.Supp.2d 1006, 1009 (N.D.Cal.2002) (quoting *O'Hagan* ). In contrast to the classical theory that deals with insider trading, the misappropriation theory reaches corporate outsiders who trade on material nonpublic information in breach of a fiduciary duty owed not to the corporation's shareholders, but to the party that gave them access to the confidential information. *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199 ("Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information"); *id.* at 652–53, 117 S.Ct. 2199 ("The classical theory targets a corporate insider's breach of duty to shareholders

with whom the insider transacts; the misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information. The misappropriation theory is thus designed to 'protec[t] the integrity of the securities markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders,' " citing *Dirks*, 463 U.S. at 655 n. 14, 103 S.Ct. 3255); *SEC v. Clark*, 915 F.2d 439, 447–48 (9th Cir. 1990) ("The underlying rationale of the misappropriation theory is that a person who receives secret business information from another because of an established relationship of trust and confidence between them has a duty to keep that information confidential. By breaching that duty and appropriating the confidential information for his own advantage, the fiduciary is defrauding the confider who was entitled to rely on the fiduciary's tacit representation of confidentiality. . . . [B]y becoming part of a fiduciary or similar relationship, an individual is implicitly stating that she will not divulge or use to her own advantage information entrusted to her in the utmost confidence. She deceives the other party by playing the role of the trustworthy employee or agent; she defrauds it by actually using the stolen information to its detriment").

Because Talbot was neither an insider of LendingTree nor the tippee of an insider tipper, the SEC bases its case against him solely on the misappropriation theory. See *O'Hagan*, 521 U.S. at 653 n. 5, 117 S.Ct. 2199 ("The Government could not have prosecuted O'Hagan under the classical theory, for O'Hagan was not an 'insider' of Pillsbury, the corporation in whose stock he traded. Although an 'outsider'

with respect to Pillsbury, O'Hagan had an intimate association with, and was found to have traded on confidential information from, Dorsey & Whitney, counsel to [the] tender offeror . . ."); *Clark*, 915 F.2d at 443 ("Significantly, the classical theory does not extend to trading on material nonpublic information by 'outsiders,' i.e. persons who are neither insiders of the companies whose shares are being traded, nor tippees of such insiders. Under this definition, Clark is an 'outsider' ").

■ To prove a section 10(b) or Rule 10b–5 violation under the misappropriation theory, the SEC must show that Talbot misappropriated material nonpublic information in breach of a duty arising from a relationship of trust and confidence, and that he knowingly used or possessed that information in a securities transaction. If these things are shown, liability attaches "regardless of whether he owed any duties to the shareholders of the traded stock." *Clark*, 915 F.2d at 443 (citing *SEC v. Materia*, 745 F.2d 197, 201–02 (2d Cir. 1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985)); see also *SEC v. Sekhri*, No. 98 Civ. 2320(RPP), 2002 WL 31100823, *12–13 (S.D.N.Y. July 22, 2002) ("A person is liable under Section 10(b) and Rule 10b–5 when he obtains material, nonpublic information intended to be used only for a proper purpose and then misappropriates or otherwise misuses that information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make 'secret profits' ").

Thus, the SEC has the burden of establishing (1) that the information Talbot received regarding the potential LendingTree Acquisition was material and nonpublic; (2) that Talbot knowingly possessed or used the information in connection with the purchase or sale of

a security; (3) that he breached a duty arising out of a relationship of trust and confidence by using the information; and (4) that he acted with scienter.

## C. Whether Information Concerning The Potential LendingTree Acquisition Was Material And Nonpublic

The threshold showing the SEC must make is that the information on which Talbot traded was both material and nonpublic. *Clark,* 915 F.2d at 443; see also *O'Hagan,* 521 U.S. at 656, 117 S.Ct. 2199 ("A misappropriator who trades on the basis of material, nonpublic information . . . gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public" (citation omitted)); *United States v. Mylett,* 97 F.3d 663, 666 (2d Cir.1996) ("Under the misappropriation theory of Rule 10b–5, insider trading occurs whenever a person trades while in knowing possession of misappropriated and material non-public information").

### 1. Whether The Information Was Material

A fact is "material" if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. See *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("[T]o fulfill the materiality requirement, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available,'" quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); see also *Abromson v.*

*Am. Pacific Corp.,* 114 F.3d 898, 902 (9th Cir.1997).

Whether particular information is material is a mixed question of law and fact. *TSC Industries,* 426 U.S. at 450, 96 S.Ct. 2126; *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1466–67 (2d Cir.1996) ("The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law. The factual component requires an inference as to whether the information would likely be given weight by a person considering that question," citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *TSC Industries,* 426 U.S. at 450, 96 S.Ct. 2126). Determining materiality requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him[;] . . . these assessments are peculiarly ones for the trier of fact." *TSC Industries,* 426 U.S. at 450, 96 S.Ct. 2126; see *Basic,* 485 U.S. at 240, 108 S.Ct. 978 ("As we clarify today, materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information," and is a "fact-specific inquiry"). Thus, in an action brought under section 10(b) or Rule 10b–5, summary judgment is proper only if the misappropriated information is " 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.' " *TSC Industries,* 426 U.S. at 450, 96 S.Ct. 2126 (quoting *Johns Hopkins Univ. v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970)); see *id.* at 450 n. 12, 96 S.Ct. 2126 (noting that "[i]n an analogous context, the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment in negligence cases").

Preliminary merger discussions can constitute material nonpublic information

for purposes of section 10(b) and Rule 10b–5. *Basic*, 485 U.S. at 236, 108 S.Ct. 978. In *Basic*, the Supreme Court expressly rejected the Third Circuit's bright-line "agreement-in-principle" doctrine, under which preliminary merger negotiations did not become "material" until an agreement on the price and structure of the merger had been achieved. *Id.* at 232–33, 108 S.Ct. 978 (citing *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 757 (3d Cir.1984), cert. denied, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985)). Rather, the Court endorsed the Second Circuit's "totality of the circumstances" test:

> "[T]he Second Circuit … explained the role of the materiality requirement of Rule 10b–5, with respect to contingent or speculative information or events, in a manner that gave that term meaning that is independent of other provisions of the Rule. Under such circumstances, materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id.* at 238, 108 S.Ct. 978 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (en banc)).

The Court noted some factors that are relevant in conducting this inquiry: In "assess[ing] the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels," such as "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." *Id.* at 239, 108 S.Ct. 978. In "assess[ing] the magnitude of the transaction to the issuer of the securities allegedly manipulated," the factfinder must consider such information as the "size of the two corporate entities and … the potential premiums over market value." *Id.* "No particular event or factor short of closing the transaction need be either necessary or sufficient by itself" to show that a reasonable investor would have found information regarding the merger discussions material. *Id.*

Lower courts applying *Basic* have identified other factors that are relevant in assessing materiality. Some courts have held, for example, that a "substantial increase in the stock price upon the public announcement of the merger" supports a finding that information regarding the transaction was material. *Sekhri*, 2002 WL 31100823 at *13; see *SEC v. Tome*, 638 F.Supp. 596, 622–23 (S.D.N.Y.1986); *SEC v. Lund*, 570 F.Supp. 1397, 1401 (C.D.Cal.1983) ("[T]he rapid increase in the trading volume and price of P & F stock following the disclosure of the joint venture confirms the conclusion that a reasonable investor would have considered this information to be important in making an investment decision with respect to P & F stock"). Other courts have found that information from "insiders" is presumptively more material than information from other sources: "[W]here information regarding a merger originates from an insider, the information, even if not detailed, 'takes on an added charge just because it is inside information.'" *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir.1997) (quoting *SEC v. Geon Industries, Inc.*, 531 F.2d 39, 47 (2d Cir.1976)); see *id.* (also considering "the importance attached to [the information] by those who knew about it," citing *Texas Gulf Sulphur Co.*, 401 F.2d at 851). Finally, some courts have found that information concerning a potential merger is less material where it is "[un]accompanied by specific quantification or otherwise implied certainty." *Elliott Associates, L.P. v. Covance, Inc.*, No. 00 Civ. 4115 SAS, 2000 WL 1752848, *9–10 (S.D.N.Y. Nov.28, 2000) (citing *Kas v. First Union Corp.*, 857 F.Supp. 481 (E.D.Va.1994), and *In re*

*Healthco Int'l, Inc. Sec. Litig.,* 777 F.Supp. 109 (D.Mass.1991)); see *Taylor v. First Union Corp. of South Carolina,* 857 F.2d 240, 244–45 (4th Cir.1988) ("The materiality of information concerning a proposed merger is directly related to the likelihood the merger will be accomplished; the more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision").

■ Here, it is undisputed that LendingTree's stock price increased by $6.03 per share, or 41%, the day the tender offer was announced. This "substantial increase" in stock price following public announcement of the acquisition on May 5, 2003, indicates that news of the potential merger significantly altered the "total mix" of information available to a reasonable investor. The record also shows that the potential premium over the market value of LendingTree stock was significant, and that at least some Fidelity directors attached a great deal of importance to information regarding the potential acquisition. William Foley, for example, testified that he told the board at the April 22, 2003 meeting that Fidelity stood to earn $50 million if LendingTree was acquired at $15 to $18 per share.[31] Cary Thompson, another director present at the meeting, testified that, after hearing Foley's remarks, he understood the acquisition negotiations were in "very advanced stages." [32] Brent Bickett testified that, as of April 22, 2003, he believed "an unnamed party was close to reaching an agreement to purchase [LendingTree]." [33]

Other evidence in the record, however, shows that Foley mentioned the potential LendingTree acquisition near the end of a four- to five-hour meeting, and that the board's discussion of the transaction was brief in comparison to the other matters it addressed.[34] There is also evidence that Foley did not identify the potential acquirer, or state a specific time frame within which the transaction might be consummated.[35] Compare *Tome,* 638 F.Supp. at 607 (finding a defendant liable for misappropriation where the parties involved in an "imminent" potential acquisition were known and defendant was not "merely speculating on what was afoot"); *Lund,* 570 F.Supp. at 1401 (finding that the information a defendant received was material because it was "specific information about a definite project," and "the proposed joint venture was a major undertaking for [the corporation] which would have a significant effect on the value of its assets and its earnings potential").

There is, moreover, a dispute as to what Foley said during the meeting, and how much detail he provided about the potential LendingTree transaction. Foley testified that, in addition to telling the board that Fidelity could earn a $50 million profit, he discussed what Fidelity would have to do if the acquisition went through—i.e., sign a lock-up agreement to hold its shares during the pendency of the transaction, and then vote its shares in favor of the acquisition.[36] Talbot testified, however, that the only thing he heard about LendingTree during the board meeting was that "somebody or 'somebodys,' persons or

---

**31.** Foley Depo. at 62:5–24.

**32.** Thompson Depo. at 41:18–24.

**33.** Bickett Depo. at 51:2–7.

**34.** Foley at 63:20–24; Christensen Depo. at 59:15–17.

**35.** Christensen Depo. at 57:30–23; Thompson Depo. at 55:2–8; Talbot Decl., ¶ 5.

**36.** Foley Depo. at 65:24–66:23.

companies were interested in acquiring the company or that the company itself would be interested in being acquired"; he asserted that no one mentioned "when [the acquisition] would occur." [37] Similarly, director Terry Christensen testified that "Mr. Foley seemed to believe that we had an opportunity to have our stock bought," but that he did not believe Foley said anything more about the potential acquisition.[38] Christensen's testimony tends to corroborate Talbot's account, and indicates that the information communicated to the board did not suggest that the Lending-Tree acquisition was certain or even likely to occur. Christensen stated: "Mr. Foley was indicating that it looked like our stock would be sold. I mean, you know, one never knows for sure, but that's what it looked like." [39]

Given these factual disputes regarding the information that Foley communicated at the board meeting, triable issues of fact remain regarding the factors that must be balanced under *Basic*—i.e., "the indicated probability that the event [would] occur" and "the anticipated magnitude of the event in light of the totality of the company activity." [40] *Basic*, 485 U.S. at 238, 108 S.Ct. 978. As a result, the court cannot find that the information the Fidelity board learned on April 22, 2003 would have been "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Industries*, 426 U.S. at 450, 96 S.Ct. 2126. Determination of the issue on summary judgment is therefore inappropriate, especially given the Supreme Court's caution that assessing materiality under section 10(b) and Rule 10b–5 is a fact-intensive inquiry "peculiarly [suited] for the trier of fact." *Id.*

## 2. Whether The Information Was Nonpublic

Under section 10(b) and Rule 10b–5, information remains "nonpublic" until either: (1) the information is "disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,'" or (2) "although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular stock.'" *Mayhew*, 121 F.3d at 50 (quoting *Dirks*, 463 U.S. at 653, 103 S.Ct. 3255, and *United States v. Libera*, 989 F.2d 596, 601 (2d Cir.1993)). Here, the undisputed evidence shows that information concerning the LendingTree tender offer was not broadly disseminated to the public until May 5, 2003, when USAI and LendingTree issued a joint press release. Prior to that date, news of the potential acquisition was known to insiders at the

---

**37.** Talbot Testimony at 43:1–6; see Talbot Decl., ¶ 5.

**38.** Christensen Depo. at 58:6–9, 59:12–14.

**39.** *Id.* at 58:6–9.

**40.** In support of its argument that the LendingTree information was material, the SEC cites Lebda's testimony that during his conversation with Bickett on April 18 or 19, 2003, he gave the following details about the potential acquisition: (1) the possible stock structure and net share price; (2) that LendingTree's board was in favor of selling LendingTree to one party; and (3) that Lending-

Tree had involved two investment banks to assist in the possible acquisition, including Allen & Company. (See Plaintiff's Reply in Support of its Motion for Summary Judgment against Defendant J. Thomas Talbot ("Pl.'s Reply") at 9.) What Lebda told Bickett on April 18 or 19, however, is not relevant in determining materiality. Rather, the issue is whether the information Talbot possessed— i.e., the information Foley communicated to Fidelity directors on April 22, 2003—reasonably indicated that the acquisition would probably occur.

two companies and to the Fidelity board. There is no evidence that any person with knowledge of the transaction other than Talbot traded in LendingTree stock between April 22 and May 5, 2003, and the significant jump in LendingTree's stock price on May 5, 2003, the day of the public announcement, demonstrates that Talbot's earlier trading had not caused the information to be fully impounded into the price prior to that date. *Id.* at 51 ("[The conclusion that information about potential merger had not been impounded into the price of the Rorer stock] is buttressed by the fact that on January 15, 1989, when the merger discussions were disclosed, the price of Rorer stock rose more than 20 percent from $49.75 to $63 per share").

Courts have held that information available to the general public in the form of rumor does not constitute "nonpublic" information for purposes of section 10(b) and Rule 10b–5. See *Mayhew*, 121 F.3d at 50 (noting that information can only be nonpublic if it is " 'specific and more private than general rumor,' " quoting *United States v. Mylett*, 97 F.3d 663, 666 (2d Cir.1996)); see *Mylett*, 97 F.3d at 666 (same). In *Mayhew*, the Second Circuit found that information about the potential takeover of a corporation was nonpublic in nature, despite the fact that several articles depicting the corporation as a vulnerable takeover target had been published prior to defendant's stock purchases. *Mayhew*, 121 F.3d at 50. Defendant argued that he could not be held liable for misappropriation because there had been widespread media speculation about a takeover, a statement by the company's president that he was willing to merge the company with "the right partner," and reports that three pharmaceutical companies had discussed a merger or takeover with the target. *Id.* at 50–51.

The Second Circuit rejected this argument, noting that the information defendant obtained from his neighbor, a financial consultant involved in the takeover transaction, "went beyond" that which had been publicly disseminated. The consultant told the defendant that the corporation "was 'actually in discussions' toward merger with a candidate or candidates," and that talks were at a " 'serious' stage." *Id.* at 51. The court concluded that this additional information, privately communicated to the defendant by a temporary insider "confirm[ed] information about which there had been speculation[,] ... len[t] a degree of immediacy to it," and "transformed the likelihood of a ... merger from one that was certainly possible at some future time to one that was highly probable quite soon." *Id.;* see *Mylett*, 97 F.3d at 666 ("While the district court acknowledged that papers such as The Wall Street Journal had speculated, on or before November 8, 1990, that AT & T might acquire NCR, it also noted that [the insider] imparted information 'that was substantially more specific than that in the newspaper' ").

Talbot contends that he acted on a rumor in purchasing LendingTree securities.[41] In his investigative interview, how-

---

**41.** Talbot Testimony at 59:3–5 ("It never occurred to me that it was a factual statement. It occurred to me that it was a rumor. I was not acting on any material fact, I was acting on rumor"); see Defendant J. Thomas Talbot's Memorandum of Points and Authorities in Opposition to Plaintiff SEC's Motion for Summary Judgment ("Def.'s Opp.") at 21 ("[Foley] did not identify the source of the information, so it could have been a rumor; he did not say that the information was inside, confidential, material or nonpublic; and he did not identify the potential buyer").

ever, Talbot could not remember hearing the purported rumor from any source other than Foley prior to his stock purchase on April 24, 2003.[42] In fact, Talbot admitted that he "had no idea whether [the rumor] was or was not" being publicly disseminated.[43] Talbot acknowledged that he wrote the words, *"Lending Tree"* on his meeting materials "because ... I felt *having heard the rumor at the meeting* that perhaps other people were interested in it."[44] This testimony establishes that Talbot's only source of information regarding the potential LendingTree acquisition was Foley. Foley imparted the information at a closed board meeting, a private setting from which the general public was excluded.[45] Foley's comments at the meeting, moreover, were specific enough to lend the general information Talbot possessed about LendingTree a degree of immediacy; Talbot admitted that the board meeting prompted him to research LendingTree further and purchase stock in the company two days later.[46]

Talbot has adduced no evidence that the information he heard at the board meeting was made public prior to April·22, 2003. See *Lund*, 570 F.Supp. at 1401 (finding that the information defendant received from an insider was nonpublic because "[t]here is no evidence that this specific information had been made public"). To the contrary, Lebda testified that when he

told Bickett about the possible acquisition on April 18 or 19, 2003, the information "was not public[ly] disclosed, obviously, at that time, because it was confidential discussions between two parties."[47] The record, therefore, does not support Talbot's claim that he acted on a rumor in purchasing LendingTree stock.

Talbot also contends that Lebda made information regarding the potential acquisition public "[b]y gratuitously disclosing [it] to Fidelity on April 18 or 19, 2003, prior to obtaining a confidentiality agreement."[48] He asserts that "there was no legitimate business reason" for Lebda to advise Bickett of the potential acquisition at so early a date, since a "Voting Agreement was unnecessary before LendingTree struck a deal with the potential buyer."[49]

This argument lacks merit. Even assuming Lebda had no legitimate business reason to advise Bickett of the possible acquisition, it is clear that he did not made the disclosure "to achieve a broad dissemination [of the information] to the investing public generally and without favoring any special person or group," and that he did not "cause[] the information to be fully impounded into the price of the particular stock." *Mayhew*, 121 F.3d at 50. Accordingly, on the present record, the court concludes that information about the potential LendingTree acquisition was nonpublic.

42. Talbot Testimony at 56:4–13.

43. *Id.* at 59:6–8.

44. *Id.* at 50:24:51:1; see also *id.* at 56:10–16 ("I had looked, I had done research on the company on the Internet and all my research indicated that it was a sound company in which to make an investment. I had also heard the comment at the board meeting that it might be in play and that therefore other people might be interested and might think

the same way I was thinking, which is that it was a good company").

45. *Id.* at 58:19–24.

46. *Id.* at 51:9–25, 58:6–8.

47. Lebda Depo. at 29:14–25.

48. Def.'s Opp. at 20.

49. *Id.*

### D. Whether Defendant Knowingly Possessed Or Used Information About The Potential LendingTree Acquisition In Connection With The Purchase Or Sale Of A Security

█ "Section 10(b) and Rule 10b–5 do not proscribe all frauds occurring in the business world, but only those 'in connection with the purchase or sale of any security.' In other words, the fraud must somehow 'touch' upon securities transactions. Thus the question here is whether there is some nexus between [the defendant's] misappropriation of confidential information and any securities transactions." *Clark*, 915 F.2d at 449; see *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir.1994). In a civil enforcement proceeding, the SEC must show that the defendant knowingly possessed or used material nonpublic information in formulating and consummating the purchase or sale of a security.[50] The SEC is not required to establish that the information in question was the sole factor driving the trader's decision to purchase or sell a security; it need only show that the information was a "significant factor" in that decision. *Smith*, 155 F.3d at 1070 n. 28 ("It is sufficient, as the district court observed, that the material nonpublic information be a 'significant factor' in the insider's decision to buy or sell").

█ Talbot testified that he heard information regarding the LendingTree acquisition at the April 22, 2003 meeting—specifically, that "somebody or 'somebodys,' persons or companies were interested in

---

**50.** In *United States v. Smith*, 155 F.3d 1051 (9th Cir.1998), superseded on other grounds, *Konop v. Hawaiian Airlines, Inc.*, 236 F.3d 1035 (9th Cir.2001), the Ninth Circuit held that in a criminal prosecution, "Rule 10b–5 requires that the government (or the SEC, as the case may be) demonstrate that the suspected inside trader *actually used* material nonpublic information in consummating his transaction," not merely that the trader possessed the information. *Id.* at 1069 (emphasis added). In reaching this result, the *Smith* court cited the Eleventh Circuit's opinion in *SEC v. Adler*, 137 F.3d 1325 (11th Cir.1998), which held that in the context of a civil enforcement proceeding, "when an insider trades while in possession of material nonpublic information, a strong inference arises that such information was used by the insider in trading," and that "[t]he insider can attempt to rebut the inference by adducing evidence that there was no causal connection between the information and the trade—i.e., that the information was not used." *Smith*, 155 F.3d at 1069 (citing *Adler*, 137 F.3d at 1337). The Ninth Circuit did not explicitly adopt the *Adler* standard, however. It stated: "Of course, we deal here with a criminal prosecution, not a civil enforcement proceeding, as was the situation in *Adler*. We are therefore not at liberty, as was the *Adler* court, to establish an evidentiary presumption that gives rise to an inference of use.... We express no view as to whether or not an *Adler*-type presumption may be employed in *civil* enforcement proceedings under Rule 10b–5." *Id.*

Following *Smith*, therefore, it is an open question (1) whether an *Adler*-type presumption applies in the Ninth Circuit; and (2) "whether [the Ninth Circuit's] 'use' standard, adopted for application in a criminal proceeding, applies as well in the context of civil proceedings under Rule 10b–5." *SEC v. Soroosh*, 166 F.3d 343, 1998 WL 904696 *2 (9th Cir. Dec.24, 1998) (Unpub. Disp.) ("We need not decide that question now, for the district court indicated that even if trading in reliance on knowledge ... were required instead of simply being in possession of inside information, it would still have found a violation of Rule 10b–5"); *SEC v. Truong*, 98 F.Supp.2d at 1100 ("assuming, without deciding, that the higher evidentiary burden in *Smith*," not the lowered evidentiary standard in *Adler*, applied in a civil enforcement proceeding).

Here, the undisputed evidence shows that Talbot not only possessed, but used, material nonpublic information in purchasing LendingTree securities. As a result, the court need not decide whether the SEC must prove "use" or mere "possession" in a civil enforcement proceeding under section 10(b) and Rule 10b–5.

acquiring the company or that the company itself would be interested in being acquired." [51] He also admitted that what he heard at the board meeting was the impetus for his decision to purchase Lending-Tree stock two days later.[52] Although he had allegedly begun following the company several years earlier, Talbot's purchase of 5,000 shares on April 24, 2003 was the first time he bought LendingTree shares. He purchased an additional 5,000 shares of LendingTree stock the next week, on April 30, 2003. The uncontroverted facts establish that Talbot was not only aware of the information communicated at the board meeting, but that he used that information in formulating and consummating transactions in LendingTree stock. Talbot himself concedes that the information he received at the board meeting played a significant role in his decision to purchase LendingTree stock. No other evidence contradicts his admission or raises a triable issue of fact as to whether he used the information he received at the board meeting in making his investment decision. This element of the required showing is therefore satisfied.

### E. Whether Defendant Breached A Duty Arising Out Of Fiduciary Relationship Or A Similar Relationship Of Trust And Confidence

There can be no violation of section 10(b) or Rule 10b–5, under either the classical or misappropriation theory of securities fraud, in the absence of a "specific relationship" between the source of the material, nonpublic information and the person who trades on that information. *O'Hagan,* 521 U.S. at 661, 117 S.Ct. 2199 (quoting *Chiarella v. United States,* 445 U.S. 222, 233, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). Unlike the classical theory,

however, which "targets a corporate insider's breach of duty to shareholders with whom the insider transacts," the misappropriation theory "outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." *Id.* at 652–63, 117 S.Ct. 2199. Misappropriation liability is therefore predicated on the existence of "a fiduciary duty or similar relationship of trust and confidence" owed to the source of the material, nonpublic information. *United States v. Chestman,* 947 F.2d 551, 566 (2d Cir.1991) (en banc).

■ Here, the undisputed evidence shows that information regarding the potential LendingTree acquisition flowed from Robert Lebda, LendingTree's CEO, to Brent Bickett and William Foley, senior officers of Fidelity, and then to the members of Fidelity's board of directors, including Talbot. There were thus several information "sources." The parties dispute which of these should be deemed the operative "source" in assessing whether Talbot breached a duty by trading on the information without disclosing that he had done so. See *O'Hagan,* 521 U.S. at 654, 117 S.Ct. 2199 ("Deception through nondisclosure is central to the theory of liability for which the Government seeks recognition.... [F]ull disclosure forecloses liability under the misappropriation theory: Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation...").

**51.** Talbot Testimony at 43:1–6; see Talbot Decl., ¶ 5.

**52.** See Talbot Testimony at 51:9–25.

Talbot contends that the source of the information was William Foley, acting in his individual capacity, and that, because he owed no duty to Foley personally, he cannot be held liable for misappropriation.[53] Alternatively, Talbot asserts that the source of the information was Lebda of LendingTree.[54] He contends that Lebda "gratuitously and prematurely disclosed the LendingTree [i]nformation to a shareholder without a preexisting confidential agreement," and that consequently Fidelity owed LendingTree no duty of confidentiality. Since "Fidelity could have traded in LendingTree shares without a breaching a fiduciary duty," Talbot argues, "*a fortiori* ... Fidelity directors ... could ... trade[ ] without breaching a fiduciary duty to Fidelity."[55] The SEC, by contrast, contends that the only relevant source of the acquisition information for purposes of determining Talbot's liability is Fidelity. It asserts that the record conclusively shows that Talbot breached his fiduciary duty to the corporation by taking confidential information disclosed at a board meeting and trading on it for his personal profit.[56]

### 1. Whether Fidelity Or Foley Was The Immediate Source Of The LendingTree Information

■ Talbot first contends that Foley— not Fidelity—should be deemed the "source" of the LendingTree information because Foley acted outside his agency for the company when he disclosed the information to the board on April 22, 2003. Talbot cites the fact (1) that LendingTree was not referenced on the meeting agenda and or in the minutes; and (2) that Foley spent only two minutes at the end of a four- to five-hour meeting discussing LendingTree. Talbot asserts that the "director-to-director relationship involved in this case is not the type of relationship the common law has recognized as inherently fiduciary."[57] Consequently, he argues, he had no legal duty to refrain from trading on the information regarding LendingTree.[58]

The SEC counters that Fidelity—not Foley—was the true "source" of the information.[59] It maintains that Foley was acting in an official capacity when he communicated the LendingTree information to the board,[60] and that the only reason the topic did not appear on the meeting agenda was that Foley did not learn of it in time to add it to the printed materials.[61]

■ Under general agency principles, a director acts within the scope of his agency when his act (1) "is of the kind he is employed to perform"; (2) occurs "substantially within the authorized time and space limits"; and (3) "is actuated, at least in part, by a purpose to serve the master." *Faragher v. City of Boca Raton,* 524 U.S. 775, 793, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting RESTATEMENT (SEC-

---

**53.** Memorandum of Points and Authorities in Support of Motion for Summary Judgment by Defendant J. Thomas Talbot ("Def.'s Mot.") at 17.

**54.** See Reply in Support of Defendant J. Thomas Talbot's Motion for Summary Judgment ("Def.'s Reply") at 1.

**55.** *Id.* at 7.

**56.** Plaintiff's Opposition to Defendant J. Thomas Talbot's Motion for Summary Judgment ("Pl.'s Opp.") at 4–5.

**57.** *Id.*

**58.** Def.'s Reply at 2–3.

**59.** Pl.'s Reply at 6.

**60.** *Id.* at 4–5.

**61.** *Id.* at 5.

OND) OF AGENCY § 228).[62] It is undisputed that Foley communicated information regarding the potential LendingTree acquisition during a regular meeting of Fidelity's board of directors. Talbot argues that Foley was not acting in his official capacity in making the disclosure because the matter was not on the official meeting agenda and the board discussed it only briefly at the end of a long meeting. This does not show that Foley acted in an unofficial capacity, however. Communicating information regarding Fidelity's investments is the kind of act that Foley, as CEO and Chairman, was employed to perform. The communication occurred within the authorized time and space limits of a board meeting, and Foley's purpose, at least in part, was to serve Fidelity by advising the board of an event that might significantly impact the company. The undisputed evidence thus shows that Foley was acting within the scope of his agency when he conveyed information regarding a possible LendingTree acquisition to his fellow directors at the April 22, 2003 meeting. See *Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.*, 156 A. 350, 351–52 (Del.Super.1931) ("The powers of a President of a corporation, i.e., the powers over its business and property, are, of course, merely the powers of an agent, for a corporation can speak in no other manner. The control over the company's business and property is vested in the Board of Directors, but subject to this control certain powers are delegated by implication to certain officers.... [T]he office of President carries with it certain implied powers of an agency. He is usually either expressly or by implied consent made the chief executive officer, [and] without special authority or explicitly delegated power he may perform all acts of an ordinary nature which by usage or necessity are incidents to his office.... [B]y virtue of his office he may ... bind his corporation in matters arising from and concerning the usual course of the corporation's business. These are the implied powers of the President of the corporation and they inhere in him by virtue of the position itself"); see also *Hessler, Inc. v. Farrell*, 226 A.2d 708, 712 (Del.1967) ("[S]ince a corporation can act only through its officers and agents, a statutory requirement that the authority to act be in writing does not apply to the corporation's principal executive officers. Their action is that of the corporation, itself, and no express authority in writing is required to justify their acts").[63] Ac-

---

**62.** See also RESTATEMENT (SECOND) OF AGENCY § 229("(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized; (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the act is seriously criminal").

**63.** Under the "internal affairs" doctrine, which California generally follows, "the law of the state of incorporation governs liabilities of officers or directors to the corporation and its shareholders." *In re Sagent Tech.*, 278 F.Supp.2d 1079, 1086–87 (N.D.Cal.2003) (citations omitted); see also *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir. 1985) ("Claims involving 'internal affairs' of

cordingly, the court finds that Fidelity—not Foley—was the immediate "source" of the information for purposes of the misappropriation theory.

This does not end the inquiry, however. Assuming Foley acted on Fidelity's behalf in communicating the acquisition information to the board, Talbot argues that he had no duty to maintain the information confidentially because Fidelity owed no such duty to LendingTree. Specifically, he asserts that if Fidelity could have traded on the LendingTree information without incurring liability under the securities laws, "it would be incongruous to find that [he] breached a duty to Fidelity because he received the . . . information from . . . Fidelity" and traded on it.[64]

In *O'Hagan*, the Supreme Court held that a partner in a law firm could be found guilty of misappropriation for trading on confidential information that the firm's client had entrusted to it. This conclusion flowed from two classic fiduciary relationships—one between attorney and client, and another between an employer and its employee. See *Chestman*, 947 F.2d at 568 (stating that examples of "associations" that are "inherently fiduciary" include the relationship "between attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder"). Many cases addressing liability under the misappropriation theory have similarly held employees liable for

exploiting confidential information that clients entrusted to their employers for business purposes. See, e.g., *SEC v. Cherif*, 933 F.2d 403, 410 (7th Cir.1991) (holding that a former bank employee misappropriated confidential information regarding the prospective financial transactions of bank clients in breach of his fiduciary duty to the bank); *Materia*, 745 F.2d at 202 (holding that the employee of a financial printing company misappropriated information about proposed tender offers from documents submitted by the company's clients in breach of a duty of confidentiality owed to his employer); *id.* (noting that in *United States v. Chiarella*, 588 F.2d 1358, 1364–69 (2d Cir.1978), rev'd. on other grounds, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the Second Circuit held that the employee of a financial printing company could be held liable for "misappropriating information from his employer and its clients"); *SEC v. Musella*, 578 F.Supp. 425, 439 (S.D.N.Y.1984) (finding that the office service manager of a law firm misappropriated and tipped material nonpublic information about the firm's corporate clients in breach of his duty of confidentiality to the law firm and its clients).

In all of these cases, the trader and the originating source of the nonpublic information were linked through a continuous chain of fiduciary relationships: The employee owed a duty to his employer to

corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation. Here, corporate indemnification involves issues peculiar to the affairs of a corporation. Indemnification of corporate directors, like the fiduciary obligations of corporate directors, is an 'internal affair' of a corporation and is therefore subject to the law of the state of incorporation," citing *Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1268 (D.C.Cir.1972), *Wilshire Oil Co. of Texas v. Riffe*, 409 F.2d 1277, 1283 & n. 16

(10th Cir.1969), and RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 302, 309 (1971)). Because Fidelity is a Delaware corporation, Delaware law guides the court's analysis of the breach of duty prong of the misappropriation theory. Because the law regarding directors' fiduciary duty of confidentiality is fairly consistent from state to state, however, relevant cases from other jurisdictions are cited.

**64.** Def.'s Reply at 5.

refrain from exploiting the information, and the employer in turn owed the same duty to the corporate client. See *Chestman*, 947 F.2d at 569 (" '[A]n agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency.' These characteristics represent the measure of the paradigmatic fiduciary relationship," citing RESTATEMENT (SECOND) OF AGENCY § 395). For this reason, the Court in *O'Hagan* characterized both the client and the law firm as the source of the information on which the firm's employee traded. See *O'Hagan*, 521 U.S. at 655 n. 6, 117 S.Ct. 2199 ("Under the misappropriation theory urged in this case, the disclosure obligation runs to the *source of the information*, here, [the law firm] and [the client]" (emphasis added)); *id.* at 655 n. 7, 117 S.Ct. 2199 ("Where, however, a person trading on the basis of material, nonpublic information owes a duty of loyalty and confidentiality to two entities or persons—for example, a law firm and its client—but makes disclosure to only one, the trader may still be liable under the misappropriation theory"); see also *Materia*, 745 F.2d at 202 (describing *Chiarella*, 588 F.2d at 1364–69, as a case where the employee of a financial printing company was held liable for "misappropriating information from his employer and its clients"); *Musella*, 578 F.Supp. at 439 (stating that the office service manager of a law firm misappropriated material nonpublic information regarding the firm's clients in breach of a duty to the firm and its clients).

Although the Court held that O'Hagan could be held liable for misappropriating information that he obtained from the firm and its client, the majority was careful to note that "[t]here is no 'general duty between all participants in market transactions to forgo actions based on material,

nonpublic information.' " *Id.* at 663, 117 S.Ct. 2199 (quoting *Dirks,* 463 U.S at 655, 103 S.Ct. 3255 (internal quotations omitted)). The mere fact that information is material and nonpublic, therefore, does not automatically bar persons who acquire access from trading on it. See *Chestman,* 947 F.2d at 566 (emphasizing that "a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information"). Rather, the scope of misappropriation liability is narrower: The theory prohibits "only 'trading on the basis of information that the wrongdoer converted to his own use in violation of some fiduciary, contractual, or similar obligation to the *owner or rightful possessor of the information.*" *O'Hagan,* 521 U.S. at 663, 117 S.Ct. 2199 (quoting Aldave, Misappropriation: A General Theory of Liability for Trading on Nonpublic Information, 13 HOFSTRA L.REV. 101, 119 (1984) (emphasis added)); see also *United States v. Falcone,* 257 F.3d 226, 234 (2d Cir.2001) ("[A] fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information.... Qualifying relationships are marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information").

A recent decision from the Southern District of New York illustrates this principle clearly. In *United States v. Cassese,* 273 F.Supp.2d 481 (S.D.N.Y.2003), aff'd., 428 F.3d 92 (2d Cir.2005), the district court considered whether the CEO of a target corporation owed a fiduciary or similar duty to the CEO of a potential acquirer. After the two corporation had engaged in preliminary acquisition discussions, the potential acquirer decided to purchase another company. Before the acquisition was publicly announced, the acquirer's CEO telephoned Cassese, president and chair-

man of the former target company, to inform him of the decision. Following the call, Cassese purchased stock in the company that was to be acquired. *Id.* at 483–84. The court held that Cassese could not be guilty of misappropriation because he did not owe a duty to the CEO of the acquiring company to refrain from trading on the nonpublic information. *Id.* at 486–88. Although Cassese arguably breached a fiduciary duty to his own corporation by putting his personal interests above the corporation's, the court nonetheless granted Cassese's motion to dismiss the misappropriation charge. *Id.* at 488.

Thus, whether Talbot breached a fiduciary or fiduciary-like duty by trading on the LendingTree information requires a two-step analysis. The court must first examine whether Fidelity owed LendingTree a duty to maintain the acquisition news confidentially. If so, it must consider whether Talbot owed Fidelity a duty of confidentiality with respect to the information Foley communicated at the board meeting. If either link is not supported by undisputed evidence, Talbot cannot be held liable for misappropriation.[65]

### 2. Whether Fidelity Owed A Fiduciary–Like Duty To LendingTree

Because Fidelity was a shareholder of LendingTree, it is undisputed that the companies shared a fiduciary relationship. The case is unlike *O'Hagan,* however, because Talbot is not alleged to have misappropriated confidential information that was entrusted to Fidelity by a client or other principal. Rather, it was the fiduciary, LendingTree, that conveyed information about the potential acquisition to its shareholder and principal, Fidelity. As a shareholder, Fidelity did not owe a fiduciary duty of confidentiality to the directors

or officers of LendingTree; rather, it was owed such a duty. See *Chestman,* 947 F.2d at 568–69 ("One acts in a 'fiduciary capacity' when 'the business which he transacts, or the money or the property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust in one part and a high degree of good faith on the other part,'" quoting BLACK'S LAW DICTIONARY 564 (5th ed.1979)). Thus, although the two companies had a fiduciary relationship with one another, that relationship did not impose a duty on Fidelity and its directors to maintain LendingTree's information confidentially. See *id.* at 567 ("Tethered to the field of shareholder relations, fiduciary obligations arise within a narrow, principled sphere").

The "specific relationship" required for misappropriation liability need not be a strictly fiduciary one, however; it may be a similar relationship of trust and confidence. See *id.* at 568 ("The misappropriation theory requires us to consider not only whether there exists a fiduciary relationship but also whether there exists a 'similar relationship of trust and confidence'"); see *Kim,* 184 F.Supp.2d at 1010 (quoting *Chestman* ). Therefore, the critical question is whether Fidelity and LendingTree shared a relationship of trust and confidence, which obligated Fidelity to maintain information regarding the potential acquisition confidentially.

*United States v. Chestman,* 947 F.2d 551, is the leading case on what constitutes the "functional equivalent of a fiduciary relationship." There, the Second Circuit emphasized that the unilateral communication of confidential information, by itself,

---

**65.** Although the court has found that triable issues of fact remain regarding the materiality of the acquisition information, this analysis presumes that the information was material.

does not create such a relationship. See *id.* at 568 ("Reposing confidential information in another ... does not by itself create a fiduciary relationship"). Rather, the relationship must independently possess the hallmarks of those that are characterized as fiduciary. *Id.* ("As the term 'similar' implies, a 'relationship of trust and confidence' must share the essential characteristics of a fiduciary association"). There must be "reliance, and de facto control and dominance," such that "confidence is reposed on one side and there is resulting superiority and influence on the other." *Id.* (citations omitted). The duty not to misappropriate arises from this relationship of "discretionary authority and dependency.... In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use." *Id.* at 569.

In *Chestman,* the defendant was a stockbroker who, between 1982 and 1986 traded in the stock of Waldbaum, Inc. for a client named Keith Loeb. *Id.* at 555. Loeb's wife had close ties to Waldbaum: Her grandmother was married to the company's founder and served on the board of directors, while her uncle, Ira Waldbaum, was the president and controlling shareholder. Chestman learned of these relationships in the course of trading for Loeb. *Id.* In 1986, Ira Waldbaum entered into an agreement with another company to sell his controlling interest in Waldbaum for $50 a share. Ira told his sister about the impending sale and asked whether she wanted to sell her shares as well. Ira cautioned his sister not to discuss the sale, as it was confidential. She nonetheless told her daughter, Loeb's wife, who in turn told Loeb. The next day, Loeb advised Chestman that he had acquired "some definite, some accurate information" that Waldbaum was going to be sold at a premium. *Id.* Chestman declined to advise Loeb regarding the matter, but that same morning, bought 3,000 shares of Waldbaum stock for his own account, and another 8,000 shares for the discretionary accounts of other clients. Loeb later purchased 1,000 shares for himself. *Id.*

Chestman was convicted of aiding and abetting Loeb's misappropriation, and also of being a tippee of misappropriated information. *Id.* at 570. Both counts required that the government prove that Loeb, the alleged principal misappropriator, breached a fiduciary duty to his wife as the supplier of the nonpublic information.[66] *Id.* In reviewing whether the government had adduced sufficient evidence to satisfy this element, the *Chestman* court focused on three aspects of the Loebs' relationship: (1) whether the husband had explicitly assumed a duty to his wife not to disclose the information; (2) whether the wife's disclosure to her husband had been inspired by a "dependence on her husband to act in her interests for some purpose"; and (3)

---

**66.** The court also considered whether Loeb breached a fiduciary duty to the Waldbaum family. It had "little trouble finding the evidence insufficient to establish a fiduciary relationship or its functional equivalent between Keith Loeb and the Waldbaum family," because "kinship" alone does not create the "necessary relationship," and there was no evidence that Loeb had been brought into the family's inner circle, which regularly discussed confidential business information with each other, or that he was a Waldbaum employee or participant in confidential communications regarding the business. Additionally, the court noted that the disclosure by his wife had been gratuitous, serving no family or business interests, and that Loeb's relationship with the family was not characterized by influence or reliance. *Id.* at 570.

whether the two had shared business confidences in the past, such that a jury might "reasonably find a relationship that inspired fiduciary, rather than normal marital obligations." *Id.* at 571.[67]

Reviewing the evidence, the court noted that Loeb had not explicitly agreed to maintain the information confidentially, and that, because there was no "pattern of sharing business confidences between the couple," he had not implicitly undertaken such a responsibility. *Id.* It observed that the wife's disclosure of the impending stock had been gratuitous and unprompted, and that "[s]uperiority and reliance ... did not mark [the couple's business] relationship either before or after the disclosure" occurred. *Id.* Finally, the court stated, there was no evidence that Loeb's wife depended on him to act in her interests, and that this reliance had prompted the disclosure. It thus concluded that the record lacked "sufficient evidence to establish the functional equivalent of a fiduciary relation." *Id.*

In *United States v. Kim,* 184 F.Supp.2d 1006, a court in the Northern District of California applied the *Chestman* criteria to a situation outside the familial context. The *Kim* court considered whether a member of an exclusive business club owed the functional equivalent of a fiduciary duty to another member, who had dis-

closed to the club moderator that he would not attend a meeting because his company was involved in merger discussions. *Id.* at 1008. Following *Chestman,* the court observed that "the primary essential characteristic of the fiduciary relation is some measure of superiority, dominance, or control." *Id.* at 1011. "[F]iduciary-like dominance," in turn, generally "arises [from] some combination of 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid." *Id.*[68] Analyzing these three factors, the court found that the business club facilitated social relationships among equals in which there was no element of superiority or dominance. Specifically, it determined that: (1) the members of the club had similar knowledge and expertise; (2) there was no persuasive need for them to share material, nonpublic information; and (3) the members did not owe each other a legal duty to render competent aid. Although each member had signed a confidentiality commitment, the court determined that the agreement did not create or affirm a legal duty, but merely "memorialize[d] a moral and ethical" one. *Id.* at 1012–13. Finding that the defendant was not bound by a fiduciary-like duty to his fellow club member, the court concluded

**67.** In outlining this three-part test, the *Chestman* court limited the "expansive construction of relationships of trust and confidence" adopted in *United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.1985), rev'd. on other grounds, 773 F.2d 477 (2d Cir.1985). There, a district court held that criminal liability under Rule 10b–5 could be based on the breach of a fiduciary duty arising out of a father-son relationship. *Id.* at 569 (citing *Reed,* 601 F.Supp. at 690). The *Chestman* court "limit[ed] *Reed* to its essential holding: [that] the repeated disclosure of business secrets between family members may substitute for a factual finding of dependence and influence and thereby sustain a finding of the functional equivalent of a

fiduciary relationship." *Id.* (explaining that in *Reed,* the evidence showed that the father and son had "frequently discussed business affairs"); see also *Cassese,* 273 F.Supp.2d at 487 (distinguishing *Reed* and *SEC v. Yun,* 327 F.3d 1263 (11th Cir.2003), on the basis that they "address[ed] the circumstances under which *familial relations* can give rise to fiduciary-like obligations for purposes of Section 10(b)" (emphasis added)).

**68.** The court left open "[w]hether all of these characteristics must be present, and to what degree." *Kim,* 184 F.Supp.2d at 1011.

that he could not be guilty of misappropriation.

In *United States v. Cassese*, 273 F.Supp.2d 481, the district court applied the factors outlined in *Chestman* and *Kim* to determine whether Cassese, the CEO of a former target corporation, shared a fiduciary relationship or its functional equivalent with Karmanos, the CEO of a corporation that had decided to acquire another company. Because it was clear that Cassese and Karmanos were "not inherent fiduciaries, but rather potential arms-length business partners," the court examined whether Cassese's relationship with Karmanos and his company had any of the indicia of a relationship of trust and confidence. *Id.* at 486. Based on the allegations in the indictment, it concluded that Cassese was under no legal duty to aid Karmanos; Karmanos did not turn to Cassese for advice or for particular knowledge or skills; "the two men shared 'similar levels of achievement, experience, and expertise' "; and "there was 'no persuasive need' for Karmanos to tell Cassese about [the other acquisition that his company had decided to make]." *Id.* at 487. Beyond preliminary acquisition discussions and a single telephone call, moreover, the two CEOs had not engaged in other discussions or transactions. *Id.* ("The Indictment alleges that Karmanos and Cassese took part in only a single telephone conversation. Contrary to the government's assertions, the Indictment alleges no facts that show that Cassese and Karmanos have a 'history, pattern, or practice of sharing confidences,' " quoting 17 C.F.R. § 240.10b–5). Indeed, the indictment did not even "allege that [the two] had a longstanding relationship or that they regularly shared confidences." *Id.* at 486.

The court emphasized that although the acquiring company had sent the potential target a confidentiality agreement covering acquisition discussions, neither Cassese nor his company had executed the agreement. *Id.* at 483 ( ... "[I]n connection with the ongoing discussions, Compuware sent Cassese and Computer Horizons a confidentiality agreement, which, among other things, sought to prohibit any Computer Horizons employee from trading securities based upon any material, nonpublic information learned from the discussions. However, neither Cassese, nor anyone else, executed the confidentiality agreement on behalf of Computer Horizons"). The court found that, in this respect, the case was even weaker than *Kim*, where members of the business club had signed a confidentiality commitment. See *id.* at 487 ("[T]he relationship between Cassese and Karmanos is weaker than in *Kim*. In the *Kim* case, the parties signed an express confidentiality agreement and regularly shared business confidences.... Here, neither Cassese, nor anyone else from Computer Horizons, executed Compuware's confidentiality agreement," citing *Chestman*, 947 F.2d at 571 ("While acceptance of [a duty of confidentiality] may be implied, it must be implied from a pre-existing fiduciary-like relationship between the parties")). Accordingly, the court granted Cassese's motion to dismiss the misappropriation charge. *Id.* at 488.

*Chestman*, *Kim*, and *Cassese* [69] hold that a fiduciary relationship or its functional

---

**69.** *Chestman*, *Kim*, and *Cassese* are criminal cases, while this is a civil enforcement proceeding. In *Chestman*, the Second Circuit noted in dicta that more flexible treatment of confidential relationships may be appropriate in the civil context. See *Chestman*, 947 F.2d at 569 ("We recognize ... that equity has occasionally established a less rigorous threshold for a fiduciary-like relationship in order to right civil wrongs arising from noncompliance with the statute of frauds, statute of wills, and parol evidence rule" (citations

equivalent exists only if the party that receives nonpublic information explicitly agrees to maintain it confidentially, or if it has an existing relationship of trust and confidence with the source of the information that places it under an implicit duty to do so. See *Falcone*, 257 F.3d at 234 ("[A] fiduciary relationship cannot be imposed unilaterally by entrusting a person with confidential information, and ... a fiduciary relationship, or its functional equivalent, exists only where there is an explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties"); see also *Yun*, 327 F.3d at 1271 ("Either an 'express agreement of confidentiality' or the 'functional equivalent' of a 'fiduciary relationship' must exist between the spouses for a court to find a confidential relationship for purposes of § 10(b) and Rule 10b–5 liability"); see generally RESTATEMENT (SECOND) OF AGENCY § 376 ("The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made...").

Thus, the SEC can survive summary judgment on the breach of duty element only if it has adduced evidence that would permit a reasonable factfinder to conclude that Fidelity either (a) explicitly undertook to maintain LendingTree's acquisition information confidentially, or (b) implicitly

accepted such a duty because it had a relationship of trust and confidence with LendingTree.

### a. Whether Fidelity Explicitly Accepted A Duty To Maintain The LendingTree's Acquisition Information Confidentially

The existence of an express confidentiality agreement covering the information at issue is persuasive evidence that the parties had a relationship of trust and confidence. See, e.g., *Cassese*, 273 F.Supp.2d at 487; see also *Falcone*, 257 F.3d at 227–28 (noting that the magazine "imposed a strict confidentiality policy prior to th[e] release on all those involved in the magazine's production and distribution"); *Materia*, 745 F.2d at 199 n. 1 (highlighting that defendant "was able to divine the identities of at least four tender offer targets" despite "scrupulous efforts by [defendant's employer] and its clients to keep confidential information confidential," and noting that the employer "had a policy explicitly forbidding its employees from trading on information they might come across in the course of their work," with "[w]ritten statements of th[e] prohibition ... posted conspicuously in [the] plant, and copies ... distributed to all employees").

It is undisputed that on April 25, 2003, three days after the Fidelity board meeting, LendingTree and Fidelity entered into a letter agreement protecting the confi-

omitted)). Nonetheless, courts have applied *Chestman*'s "functional equivalent of fiduciary relationship" standard in the civil context. See *SEC v. Kornman*, 391 F.Supp.2d 477, 487 & n. 4 (N.D.Tex.2005) (noting that "the court need not determine whether the definition of a duty of loyalty and confidentiality should be expanded in a civil context, since the court determines that the SEC's complaint sufficiently alleges a fiduciary-like duty under the factors set forth in *Chestman*"); *SEC v. Falbo*, 14 F.Supp.2d 508, 523 (S.D.N.Y.1998)

(employing *Chestman*'s definition of the functional equivalent of a fiduciary relationship in a civil case); see also *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d. Cir.1980) (applying a similar definition of a fiduciary-like relationship in the civil context). The court finds the analysis regarding relationships of trust and confidence in *Chestman*, *Kim*, and *Cassese* instructive in the civil context, and therefore applies that standard in deciding the parties' cross-motions.

dentiality of nonpublic information LendingTree intended to provide to Fidelity so that it could consider the USAI acquisition (the "2003 Confidentiality Agreement").[70] Under the 2003 Confidentiality Agreement, Fidelity agreed to maintain confidentially all information it received concerning the potential transaction, "including that the Company is considering a Possible Transaction or any of the terms, conditions or other facts with respect to a Possible Transaction, (including the status thereof) that [Fidelity] or its Representatives (as defined below) may be provided by or on behalf of the Company."[71] Fidelity agreed "not to disclose or allow disclosure to others of any Confidential Information, except that, [Fidelity] may disclose Confidential Information to its directors, officers, employees, partners, affiliates, agents, advisors or representatives (hereinafter, 'Representatives'), to the extent necessary to permit such Representatives to assist [Fidelity] in evaluating and analyzing a Possible Transaction, *provided, however*, that [Fidelity] shall instruct each such Representative to be bound by the terms of this Agreement to the same extent as if they were parties hereto . . . ."[72]

The parties appear to agree that the 2003 Confidentiality Agreement is immaterial to the issue of breach of duty, since it was executed after the information in question was disclosed to Fidelity's officers and board.[73] The SEC contends, however, that at the time of disclosure, Fidelity already had a contractual duty of confidentiality to LendingTree under a 2002 nondisclosure agreement between the companies.[74] Talbot disputes that this contract covered information regarding the potential acquisition.[75]

The LendingTree, Inc. Reciprocal Non–Disclosure Agreement, executed on January 7, 2002 (the "2002 Non–Disclosure Agreement"), provides for "the mutual non-disclosure of confidential information" between LendingTree and Fidelity.[76] Paragraph 1(a) defines "Confidential Information" as nonpublic information including, without limitation,

"information relating to: released, unreleased or planned Disclosing Party products, services, or offerings; the plans or activities related to the marketing or promotion of any Disclosing Party product, services or offering; Disclosing Party's business policies or practices, product specifications, services, and offerings including, but not limited to, Disclosing Party's business strategy and marketing plans, price lists, pricing policies and financial information, inventions, patents

---

**70.** See Horn Opp. Decl., Exh. 1 (Christensen Depo., Exh. 1 (2003 Confidentiality Agreement)).

**71.** *Id.*

**72.** *Id.*

**73.** Pl.'s Facts, ¶ 8 (stating that the 2003 Confidentiality Agreement is immaterial to any genuine issue in the case); Def.'s Reply at 4. It is clear from the face of the contract that the 2003 Confidentiality Agreement was intended to cover information that Fidelity learned *after* April 25, 2003. (See Horn Opp. Decl., Exh. 1 (Christensen Depo., Exh. 1 (2003 Confidentiality Agreement) ("In con-

nection with a possible transaction (a 'Possible Transaction') involving LendingTree, Inc. (together with its subsidiaries and affiliates, the 'Company'), Fidelity National Financial, Inc. (together with its subsidiaries and affiliates, 'FNF'), as a stockholder of the Company, *has requested* certain non-public and confidential information (the 'Confidential Information'))'' (emphasis added).)

**74.** Pl.'s Reply at 4; Pl.'s Genuine Issues, ¶ 10.

**75.** Def.'s Mot. at 5 n. 6.

**76.** See Notice of Lodging of January 7, 2002 Confidentiality Agreement, Exh. A (2002 Non–Disclosure Agreement).

and patent applications, discoveries, ideas, concepts, software in various stages of development, designs, drawings, specifications, techniques, models, data, source code, object code, documentation, diagrams, flow charts, research, development, processes, procedures, 'know-how,' and trade secrets; any and all customer information, including without limitation, customer lists, customers names, addresses, property descriptions, credit information, loan offer and approval information, price lists, pricing policies and financial information and all other information related to customers; and information received from others that Disclosing Party is obligated to treat confidential." [77]

Paragraph 1(c) defines "Confidential Materials" as "all tangible materials containing Confidential Information, including, without limitation, electronic, written or printed documents and computer disks or tapes, whether machine or user readable." [78]

The 2002 Non–Disclosure Agreement prohibits the party receiving Confidential Information or Confidential Materials (the "Receiving Party") from disclosing them to third parties for a period of one year following disclosure, subject to specified exceptions.[79] It also outlines the Disclosing Party's rights and remedies if Confidential Information or Materials are disclosed. First, the Receiving Party is required "to notify Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information and/or Confidential Materials ... by Receiving Party, and [to] cooperate with Disclosing Party in every reasonable way to help Disclosing Party regain possession of the Confidential Information and/or Confidential Materials and prevent its further unauthorized use." [80] Second, the Receiving Party must "return all originals, copies, reproductions and summaries of Confidential Information or Confidential Materials at Disclosing Party's request, or, at Disclosing Party's option, certify destruction of the same." [81] Third, the Disclosing Party is "entitled, without waiving any other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction." [82] Fourth, the Disclosing Party has the right to "visit during normal business hours Receiving Party's premises to review Receiving Party's compliance with the terms of this Agreement, subject to reasonable prior notice and such other restrictions as Receiving Party shall deem reasonably necessary to ensure minimal disruption of its business activities." [83]

The 2002 Non–Disclosure Agreement also contains provisions governing the parties' property rights to Confidential Information and Materials. Paragraph 4(a) states that "[a]ll Confidential Information and Confidential Materials are and shall remain the property of Disclosing Party,"

77. *Id.,* Exh. A (2002 Non–Disclosure Agreement), ¶ 1(a).

78. *Id.,* ¶ 1(c).

79. *Id.,* ¶ 2(a) ("Receiving Party shall not disclose any Confidential Information to third parties for one (1) year following the date of its disclosure by Disclosing Party to Receiving Party, except (i) to Receiving Party's employees or consultants as provided below, or (ii) in accordance with judicial or other government order, provided Receiving Party shall give Disclosure Party reasonable notice prior to such disclosure and shall comply with any applicable protective order or equivalent").

80. *Id.,* ¶ 3(a).

81. *Id.,* ¶ 3(b).

82. *Id.,* ¶ 3(c).

83. *Id.,* ¶ 3(d).

and that "[b]y disclosing information to Receiving Party, Disclosing Party does not grant any express or implied rights . . . to or under [its] patents, copyrights, trademarks, or trade information."[84] Paragraph 4(b) provides, however, that:

> "[t]he terms of confidentiality under this Agreement shall not be construed to limit either party's right to independently develop or acquire products without use of the other party's Confidential Information. Further, either party shall be free to use for any purpose the residuals resulting from access to or work with such Confidential Information as provided herein. The term 'residuals' means information in non-tangible form, which may be retained by persons who have had access to the Confidential Information, including ideas, concepts, know-how or techniques contained therein. Neither party shall have any obligation to limit or restrict the assignment of such persons or to pay royalties for any work resulting from the use of residuals. However, the foregoing shall not be deemed to grant either party a license under the other party's copyright or patents."[85]

The 2002 Non–Disclosure Agreement states that it is an integrated contract, which "constitutes the entire agreement between the parties with respect to the subject matter hereof."[86] It contains a choice-of-law provision, which requires that the contract "be construed and controlled by the laws of the State of North Carolina."[87]

■ Under North Carolina law, the court must give effect to the reasonably shared intentions of the parties as expressed in the contract. See *Gulf Refin-ing Co. v. Charlotte Const. Co.*, 157 N.C. 277, 72 S.E. 1003, 1005 (1911) (" 'It is well recognized that the object of all rules of interpretation is to arrive at the intention of the parties as expressed in the contract, and that in written contracts which permit of construction this intent is to be gathered from a perusal of the entire instrument,' " quoting *Atlantic & N.C.R. Co. v. Atlantic & N.C. Co.*, 147 N.C. 368, 61 S.E. 185, 189–90 (1908)); *Reaves v. Hayes*, 620 S.E.2d 726, 729 (N.C.App.2005) ("In interpreting a contract, our courts adhere to the following principles: '[T]he goal of construction is to arrive at the intent of the parties when the [contract] was [written]. Where a [contract] defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect. . . . [I]f the meaning of the [contract] is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein," quoting *Gaston County Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C. 293, 524 S.E.2d 558, 563 (2000)).

When the 2002 Non–Disclosure Agreement is read as a whole, it is clear that the parties' intent in entering into the contract was to protect the confidentiality of business information that Fidelity and LendingTree anticipated they would share in carrying out joint business projects. The

---

**84.** *Id.,* ¶ 4(a).

**85.** *Id.,* ¶ 4(b).

**86.** *Id.,* ¶ 4(c).

**87.** *Id.,* ¶ 4(d).

intent was *not* to safeguard nonpublic information regarding their shareholder-agent relationship. The contract contains a detailed definition of "Confidential Information," which, under North Carolina law, must be given effect. The only portion of that definition that could arguably be said to cover the sharing of acquisition plans is a reference to the "Disclosing Party's business strategy." This phrase does not appear in isolation, however; rather, the contract refers in tandem to "business strategy and marketing plans." Considered in combination with the balance of the definitional paragraph, which concerns product development, marketing, pricing, and promotion, and customer information of various types, the ordinary meaning of "business strategy" does not extend to information regarding a possible acquisition by a third party.[88]

This interpretation is confirmed by a review of other contract provisions, which, *inter alia,* address ownership of or property rights in the Confidential Information, treatment of the Disclosing Party's copyrights, patents, trademarks, and trade secrets, and the use of ideas, concepts, know-how or techniques suggested by the Confidential Information. These provisions would make little sense if the fact of a possible acquisition fell within the definition of Confidential Information. Construing the contract as a whole, therefore, reinforces the view that the definition is not sufficiently broad to encompass such information. Reading the 2002 Non-Disclosure Agreement expansively to cover information shared by the corporations regarding LendingTree's possible acquisition would thus be unreasonable. As a consequence, the court concludes that no express confidentiality agreement was in place at the time Lebda communicated the acquisition information to Fidelity's officers, and they conveyed it to Talbot.

■ The SEC contends that even without a preexisting confidentiality agreement, Fidelity owed LendingTree a duty to maintain the acquisition information confidentially. It argues that when Lebda disclosed the information to Bickett, both were acting as agents of their respective corporations, and Lebda made the disclosure for a confidential business purpose.[89] This ignores the fundamental principle that "[r]eposing confidential information in another . . . does not by itself create a fiduciary relationship." *Chestman,* 947 F.2d at 568; see *O'Hagan,* 521 U.S. at 663, 117 S.Ct. 2199 ("There is no 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information'" (citations omitted)). For this reason, even if the information was otherwise confidential, Fidelity was not obligated to maintain it confidentially simply because LendingTree elected to communicate the information to it.[90]

---

88. Although it might be argued that the possibility of an acquisition was "information received from others [e.g., USAI] that [LendingTree was] obligated to treat [as] confidential" (*id.,* ¶ 1(a)), there is no evidence in the record that LendingTree was bound by a confidentiality agreement with the potential acquirer.

89. Pl.'s Reply at 3.

90. Bickett testified that Lebda never told him, during their telephone conversation on April 18 or 19, that information regarding the potential acquisition had to be kept confidential. (See Bickett Depo. at 42:17–43:10 ("A. I got a phone call from Doug [Lebda] sometime in early April. . . . Q. And did Mr. Lebda reveal to you the party that was interested in acquiring LendingTree at that time? A. No, he didn't. Q. Did Mr. Lebda tell you that the information he had just—that he had provided to you in that conversation that that information was confidential? A. No").) Although Bickett later stated that he implicitly understood the information was confidential (see Bicket Depo. at 44:5–7 ("Well, [Lebda's] the CEO of a public company, and I know

Nor did Lebda's belief or intent that Fidelity would refrain from disclosing the information impose a duty of confidentiality on the corporation or its directors. As the Second Circuit held in *Walton*, 623 F.2d 796, an expectation on the part of the source that a party receiving nonpublic information will refrain from trading on it is insufficient to impose a duty of confidentiality. There, Morgan Stanley & Co. was hired to investigate acquisition targets for Kennecott Copper Corporation. One of the potential targets Morgan Stanley considered was Olinkraft, Inc. *Id.* at 797. To facilitate a possible deal, Olinkraft gave Morgan Stanley confidential internal earnings projections. It instructed the investment firm, however, "that the Confidential Inside Information was to be used in connection with the Kennecott Bid and was to be returned to Olinkraft if such bid did not go through." *Id.* While Kennecott ultimately declined to bid on Olinkraft, other companies did. *Id.* After one company announced an offer to buy Olinkraft, Morgan Stanley purchased 149,200 shares of Olinkraft common stock. *Id.* The firm then disclosed the internal earnings information to another one of its clients "in an effort to induce [that client] to make a substantially higher offer" for Olinkraft. *Id.*

Olinkraft shareholders sued Morgan Stanley, alleging that it had misappropriated the confidential earnings information in breach of a duty that it owed Olinkraft. The district court granted Morgan Stanley's motion to dismiss the complaint for lack of standing. *Id.* at 797–98. The Second Circuit upheld the district court's order on the basis that the complaint failed to state a claim upon which relief could be granted. The circuit court held that Morgan Stanley's receipt of confidential information did not automatically transform it into Olinkraft's fiduciary. *Id.* at 799. As the court stated: "[T]he fact that the information was confidential did nothing, in and of itself, to change the relationship be-

---

that, you know, when I get information from him on that capacity that it's confidential")), his testimony clearly shows that he never explicitly assumed a duty of confidentiality on Fidelity's behalf.

Lebda, moreover, does not contradict Bickett. Although Lebda testified that he told Bickett the information was confidential, he conceded he did not recall that Bickett acknowledged his comment or agreed to maintain the information confidentially. (See Lebda Depo. at 34:4–7 ("Q. But did Mr. Bickett say anything to you about the confidentiality of this information during your discussion with him? A. I don't recall").) Lebda also did not testify that he requested confidentiality *before* disclosing the information to Bickett. (See *id.* at 28:7–16 ("My recollection is that I told him that we had—that another party had made an offer to acquire LendingTree. I described the CVR and stock structure to him, but said the net share price was in the $14–$15 range; that the Board was—majority of the Board was in favor of the transaction. And that it was not a competitor of Fidelit[y's]. *And I also told him that he would need*

*to keep this information confidential*" (emphasis added).) In fact, Lebda's testimony indicates that he simply assumed that Bickett and Fidelity would maintain the information confidentially. (*Id.* at 34:8–13 ("Q. What was your understanding of what Mr. Bickett would do with the information that you provided him regarding the acquisition? A. *I would assume him* to keep it confidential" (emphasis added)); see also *id.* at 29:14–25 ("Q. And why did you believe the information to be confidential? A. Because it was not publicly disclosed, obviously, at that time, because it was confidential discussions between two parties—because we had a previously signed Confidentiality Agreement with Fidelity. And because, as a significant shareholder of the company, *I would have assumed them to be, you know, insider status;* and, therefore, needing to keep the information confidential" (emphasis added).) In sum, Lebda's testimony corroborates Bickett's assertion that the two men did not explicitly agree that the information they shared during the informal telephone call of April 18 or 19, 2003 would be maintained confidentially.

tween Morgan Stanley and Olinkraft's management. Put bluntly, although, according to the complaint, Olinkraft's management placed its confidence in Morgan Stanley not to disclose the information, Morgan Stanley owed no duty to observe that confidence." *Id.* (cited in *Chestman,* 947 F.2d at 568).

Olinkraft had not hired Morgan Stanley, and, at the time it obtained the confidential information, Morgan Stanley was working for Kennecott, not Olinkraft. *Id.* at 798. Because "Morgan Stanley and Olinkraft's management were at all times responsible to different interests," the court determined that the two companies "must be presumed to have dealt, absent evidence of an extraordinary relationship, at arm's length." *Id.* Since the complaint did not allege that Morgan Stanley and Olinkraft had entered into a prior agreement or understanding requiring confidentiality, the court concluded that Morgan Stanley was not bound by any legal duty to refrain from using or disclosing the earnings information. See *id.* at 799 ("To be sure, in some instances the management of a potential target, such as Olinkraft, might be required by its responsibility to the shareholders' interest to cooperate, and even to disclose confidential information, to a potential acquirer or a financial advisor who, as did Morgan Stanley, stands at arm's length. *But that obligation, while it burdens management, which might therefore reasonably insist*

*upon an agreement of confidentiality, does not change the relationship between the target and the acquirer or its advisor.* Appellants' complaint alleges no such agreement or understanding" (emphasis added)).

Here, the 2002 Non–Disclosure Agreement makes clear that LendingTree and Fidelity's management were at all times responsible to different interests, and dealt with each other at arm's length. Thus, if LendingTree wanted to keep information regarding its potential acquisition confidential, it should have insisted upon a confidentiality agreement before disclosing that information to Fidelity's officers. Because it failed to do so, neither Fidelity nor its directors were under a legal duty to refrain from using or disclosing that information.

b. **Whether The SEC Has Adduced Evidence That Would Permit A Reasonable Factfinder To Find A Relationship Of Trust And Confidence Between Fidelity And LendingTree**

■ As noted, a relationship of trust and confidence is characterized by a combination of the following factors: (1) a history of shared confidences; (2) a disparity of knowledge and expertise; and/or (3) a persuasive need for the source to disclose the information. *Kim,* 184 F.Supp.2d at 1011; see also 17 C.F.R. § 240.10b5–2.[91]

---

**91.** The SEC cites Rule 10b5–2 as the standard for determining when "a person has a duty of trust or confidence for purposes of the 'misappropriation' theory of insider trading under Section 10(b) of the Act and Rule 10b–5." The regulation reads, in pertinent part:

"(b) ... For purposes of this section, a 'duty of trust or confidence' exists in the following circumstances, among others:

(1) Whenever a person agrees to maintain information in confidence;

(2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality...."

The SEC has adduced no evidence regarding these factors that would allow a reasonable factfinder to conclude that a relationship of trust and confidence existed between Fidelity and LendingTree. First, the record contains no evidence that the two companies had a history of shared confidences. While the 2002 Non–Disclosure Agreement suggests that LendingTree and Fidelity may have exchanged confidential product and/or customer information between July 2002 and April 2003, their communications on these subjects were confidential only because the corporations mutually assumed a contractual duty not to disclose the information. There is no evidence that, beyond this limited undertaking, the companies routinely exchanged confidential business information.

Second, there is no evidence that there was a disparity of knowledge or expertise between the companies, such that "confidence [was] reposed on [Fidelity's] side and there [was] resulting superiority and influence on [LendingTree's] side." *Chestman*, 947 F.2d at 568. In their shareholder-agent relationship, it was the shareholder, Fidelity, that reposed confidence in the management of LendingTree to protect and enhance its investment. It was LendingTree's management, in turn, that held a position of superiority and influence respecting the use of those assets. The shareholder relationship, therefore, provides no basis for concluding that LendingTree reposed confidence in Fidelity to maintain the information confidentially.[92] Outside that relationship, moreover, the

Rule 10b5–2 was not intended to apply to business relationships. See SEC Release Nos. 33–7881, 34–43154, IC–24599 ("Rule 10b5–2 addresses the issue of when a breach of a family or other non-business relationship may give rise to liability under the misappropriation theory of insider trading"). Because this case deals with purely business relationships, the court applies *Kim* 's three-part test instead of the standard articulated in Rule 10b5–2. Even were this test applied, however, the result would not change, as the SEC has adduced no evidence of an express agreement by Fidelity to maintain the acquisition information confidentially, nor a "history, pattern or practice of sharing confidences" absent such an agreement.

**92.** A minority shareholder such as Fidelity owes fiduciary duties to the corporation whose stock it owns when it dominates or controls the corporation's board or business affairs. See, e.g., *Kahn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110, 1114 (Del. 1994) ("This Court has held that 'a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.' With regard to the exercise of control, this Court has stated: '[A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status. For a domi-

nating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporation conduct' "); *In re Shoe–Town, Inc. Stockholders Litigation*, 1990 WL 13475, *6, 16 Del. J. Corp. L. 404, 416 (Del. Ch. Feb 12, 1990) (endorsing "the view that a non-majority shareholder owes no fiduciary duty absent specific factual allegations that the minority shareholder dominated and controlled the corporation"); *In re Sea–Land Corp. Shareholders Litigation*, 1988 WL 49126, *3, Fed. Sec. L. Rep. ¶ 93,923 (Del.Ch. May 13, 1988) ("Under Delaware law a stockholder has fiduciary obligations only if it is a controlling stockholder. A stockholder is not deemed controlling unless it owns a majority of the stock, or has exercised actual domination and control in directing the corporation's business affairs," citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del.Supr.1984); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del.Ch.1984); and *Kaplan v. Centex Corp.*, 284 A.2d 119, 122–23 ( Del.Ch.1971)); see also *Solomon v. Armstrong*, 747 A.2d 1098, 1117 n. 61 (Del.Ch. 1999) ("In order for a plaintiff to successfully allege domination in the absence of controlling stock ownership, a plaintiff must allege literal control of corporate conduct"). As noted, there is some dispute respecting the percentage of LendingTree shares that Fidelity owned prior to USAI's acquisition: Talbot

two corporations dealt as equals with similar knowledge and expertise. See *Kim*, 184 F.Supp.2d at 1012–13. No evidence, moreover, suggests that Fidelity owed a legal duty to aid LendingTree in the acquisition or to act in its best interests in handling the acquisition information. Compare *Kornman*, 391 F.Supp.2d at 488–89 (finding that the SEC had adequately alleged a fiduciary-like relationship between a tax and estate planning advisor and the CEOs of two corporations because the fact "[t]hat Kornman possessed superior knowledge as to the subject matter of tax and estate-planning may serve as an indicator that a duty of trust and confidence had developed between Kornman and the two executives," and because the complaint alleged that "the disclosures by the two executives served a purpose, namely, disclosures regarding personal financial information were needed for [the defendant] to provide professional advice regarding tax and estate-planning to clients," and "[the defendant's company] had in place numerous confidentiality safeguards, from which a reasonable inference can be drawn that [defendant], himself, recognized [his company's] services necessarily entailed the sharing of confidential information and the consequent need to protect confidential information received from clients and prospective clients").

Third, the SEC has failed to adduce evidence that might show that Lending-Tree had a *persuasive* need to inform Fidelity of the potential acquisition prior to obtaining a confidentiality agreement. See *Kim*, 184 F.Supp.2d at 1011; see also *Cassese*, 273 F.Supp.2d at 487. While Lebda's deposition testimony suggests that his telephone call to Bickett on April 18 or 19 was motivated by a business purpose,[93] Lebda acknowledged that he did not tell Bickett the identity of the potential acquirer or the likelihood that the acquisition would go through—two pieces of information that Fidelity would have needed to consider in assessing whether to enter into a voting agreement.[94] Additionally, even if

---

contends that Fidelity owned 8 to 9 percent of LendingTree's publicly traded stock; the SEC asserts that Fidelity owned at least 10 percent. (See Def.'s Facts, ¶ 4 (Thompson Depo. at 31:5–8); Pl.'s Genuine Issues, ¶ 2 (Lebda Depo. at 14:11–15:3; Christensen Depo. at 36:15–19).) Even assuming the SEC's higher number is correct, it is clear that Fidelity did not own a *majority* of LendingTree's shares. Moreover, the SEC has adduced no evidence that Fidelity exercised dominance or control over LendingTree's board or corporate affairs. Accordingly, the limited exception to the general rule that shareholders do not owe fiduciary duties to the corporation in which they own stock does not apply.

93. See Lebda Depo. at 27:20–28:2 ("Q. And why did you contact Mr. Bickett [on April 18 or 19, 2003]? A. I contacted him because, as a significant shareholder of the company, we knew that they would need to ultimately consent to a transaction, if it happened. And so I would have told him, so that he would be prepared to—to receive and evaluate the consent that we would need from him").

94. See *id.* at 27:20–29:5 ("Q. Did you disclose who the third party was that was interested in acquiring LendingTree to Mr. Bickett on April 18th or 19th? Not to the best of my recollection, I did not. Q. And did you discuss with him the likelihood of the acquisition being finalized at that time? A. I don't recall discussing the likelihood of it being finalized"); see also *id.* at 36:11–21 ("Q. What if any subsequent conversations did you have with Mr. Bickett regarding the acquisition after April 18th or 19th? A. We discussed the acquisition again on April 25th. Q. And what was the nature of that discussion, at that time? A. *Similar to the first discussion. It was to update him on the progress of the acquisition. And to, by this point, give him the Form of Consent, that they would be required to sign*" (emphasis added)).

Lebda, moreover, testified that he believed it was necessary to execute the 2003 Non–Disclosure Agreement to protect the confidentiality of the information that LendingTree planned to share with Fidelity regarding the potential acquisition. (See *id.* at 69:4–25 ("A.

Lebda's testimony could be said to raise a triable issue of fact regarding the existence of a persuasive reason for early disclosure, under *Kim,* "some combination" of the three factors is necessary to establish the existence of a relationship of trust and confidence. *Kim,* 184 F.Supp.2d at 1011. The SEC has presented no evidence raising a triable issue of fact regarding the two remaining factors—a history of shared confidences and a disparity of knowledge or expertise. Consequently, it has not adduced sufficient evidence from which a reasonable factfinder could conclude that a relationship of trust and confidence existed between the two corporations.

### c. Conclusion Regarding Breach Of Duty

When the party moving for summary judgment does not bear the burden of proof at trial, he can obtain a judgment in his favor simply by showing that there is an absence of evidence to support the opposing party's case. See *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. The SEC has failed to adduce evidence that would permit a reasonable factfinder to conclude that Fidelity—and derivatively, its directors—owed LendingTree a duty to maintain confidentially the acquisition information received prior to the execution of a confidentiality agreement on April 25, 2003. Because the SEC has not carried its burden with respect to this essential element, Talbot's motion for summary judgment must be granted.

What other agreements [were entered into between Fidelity and LendingTree between April 29th and May 5th?] A. A Confidentiality Agreement, signed on or about April 25th.... Q. And did you feel it was necessary to have that agreement signed between LendingTree and Fidelity on or about April 25th? A. Yes. Q. Why is that? A. It was standard procedure, that we had with—the standard procedure that we undertook with Fidelity. Because I was going to discuss the details of the merger transactions. Q. And in order to protect those discussions, you believed it important to have this Confidentiality Agreement? A. Yes. Q. And was that the second Confidentiality Agreement, essentially, that had been entered into between Fidelity and LendingTree? A. Yes").)

## III. CONCLUSION

For the foregoing reasons, the court grants defendant's motion for summary judgment, and denies plaintiff's motion for summary judgment.